THE HARTFORD FIRE INSURANCE COMPANY v. HENRY S. RAYMOND, COMMISSIONER OF INSURANCE.

*Foreign insurance companies—Right to carry on business in Mich-igan—Revocation of license—Jurisdiction of Commissioner of Insurance—Constitutional law—Title of act.*

1. The object of Act No. 285, Laws of 1887, is fairly indicated in its title, "An act to regulate the manner in which insurance companies *not* organized under the laws of this State, but doing business within it, shall transact their business."

2. The omission from the title of an act to prohibit or regulate a certain business, of a statement that its object is also to punish its violators, will not render it invalid.

3. Corporations organized under the laws of other states, to carry on business not open to citizens generally, cannot engage in the same in this State, except upon permission, express or implied, to do so.

4. Corporations of one state have no right to exercise their franchises in another state except upon the assent of the latter, and upon such terms as it may impose, which, whether reasonable or unreasonable, are absolutely within the discretion of the Legislature.

5. The power of the Commissioner of Insurance, under Act No. 285, Laws of 1887, to grant or to revoke a license, is but ministerial in its nature, and the objection that he exercises judicial functions is untenable.

6. Upon the facts stated in the opinion, relator is held to have been attempting to pursue its business in this State in a manner prohibited by Act. No. 285, Laws of 1887, under a scheme prepared for the purpose of securing the same result as the old arrangement, sought to be controlled and regulated by said act, which is valid, and the revocation of relator's license by the respondent is held to have been authorized.

*Mandamus.* Submitted April 17 and 18, 1888. Denied June 8, 1888.

Relator applies for *mandamus* to compel respondent to

70 485
72 619
70 485
76 171

70 485
80 246

70 485
88 384

70 485
105 60
105 404

70 485
106 602

70 485
107 424

70 485
112 577

70 485
126 553

70 485
s38NW 474
132 ³227

70 485
140 ³351

70 485
f150 ¹203
150 654

70 485
145 ³177

vacate an order revoking its license to do business in this
State.    The facts are stated in the opinion.

*F. A. Baker* (*Marston, Cowles & Jerome,* of counsel), for
relator.

*Moses Taggart,* Attorney General, for respondent.

[The points of counsel, and authorities, are so fully stated
and cited in the opinion, that their restatement is omitted.—
REPORTER.]

LONG, J.    Relator filed a petition for *mandamus* to compel
the respondent, the Commissioner of Insurance of the State
of Michigan, to vacate an order made by him on April 2,
1888, revoking the license of relator to do business within
this State.

The relator is an insurance corporation organized and exist-
ing under the laws of the state of Connecticut, and for many
years has transacted an insurance business in the State of
Michigan.    In February, 1887, it filed the necessary proofs
and papers with the Commissioner of Insurance to obtain,
and did obtain, a renewal of its authority to do business in
the State of Michigan, and paid to the State Treasurer the
specific taxes due from it for the preceding year, and contin-
ued to do business in this State for the year 1887.

At its session in 1887 the Legislature of this State passed
an act which was approved June 28, 1887, entitled—

" An act to regulate the manner in which insurance com-
panies not organized under the laws of this State, but doing
business within it, shall transact their business."

Section 1 of this act, by its terms, requires all fire, marine,
or inland insurance companies or associations, in addition to
the requirements of the law in force, to file with the Com-
missioner of Insurance an undertaking that it will not
directly or indirectly enter into any contract, agreement,

arrangement, or undertaking of any nature or kind whatever with any other company, companies, association, or associations, or the agents of their respective companies or associations, in the business transacted in this State.

Section 2 absolutely forbids the making by any such insurance company of any contract of the character mentioned in section 1.

. Section 3 prohibits the agents of any such company or association from making any such contract with the agent or agents of any other company. .

Section 4 declares it unlawful for any agent, solicitor, broker, surveyor, or any one in any other capacity to transact or aid in transacting business for any company violating said act.

Section 6 makes it the duty of the Commissioner to provide a blank form contract required under the first section of the act, and to mail the same to each company not incorporated under the laws of this State, but doing business therein under authority from the Commissioner of Insurance.

This section makes it the express duty of the Commissioner of Insurance to—  .

" Revoke the certificate of each and every of said companies or associations which shall not file such undertaking"—

Properly filled, executed, and authenticated within 30 days ,after the mailing of said blanks to said companies.

Section 7 makes it the duty of the Commissioner of Insurance, on notice of " any violation of the provisions of this act," to investigate, and, if satisfied that any company is violating its undertaking, or section 2 of the act, or that its agents are so violating the same, " to forthwith revoke the certificate granted in behalf of such company or association."

In January, 1888, relator applied to the Commissioner of Insurance for a renewal of its authority, and on February 28,

1888, filed with the Commissioner the agreement provided for by the act of 1887.    This agreement is as follows:

"*Know all men by these presents,* That the Hartford Fire Insurance Company, of the city of Hartford, in the state of Connecticut, a body corporate by or under the laws of Connecticut, and fully authorized to conduct the business of fire, or fire and marine, and inland insurance, having been admitted or having applied for admission to transact the business of fire insurance in the State of Michigan, in conformity with the laws thereof, and in compliance with Act No. 285, Laws of 1887, does hereby undertake, stipulate, promise, and agree that it will not directly or indirectly enter into any contract, agreement, arrangement, or undertaking of any nature or kind whatever with any other company, companies, association, or associations, the object or effect of which is to prevent open and free competition between it and said company, companies, association, or associations, or the agents of their respective companies or associations, in the business transacted in the State of Michigan, or in any part thereof."

This agreement was signed by the president and the secretary of the company, and to it was affixed its corporate seal. At the time of filing this agreement with the Commissioner, the relator served upon the Commissioner the following protest:

"*To the Honorable, the Commissioner of Insurance of the State of Michigan:*

"Act No. 285 of the State of Michigan requires insurance companies, not organized under the laws of your State, as a condition precedent to transacting business therein, to execute and file with you an undertaking that they will not, directly or indirectly, enter into any contract, agreement, arrangement, or undertaking of any nature or kind whatever with any other company, companies, association, or associations, the object or effect of which is to prevent open and free competition in the business transacted in the State, or any part thereof.    This act also, in terms, makes it unlawful for agents of companies to enter into like contracts for similar purposes, and attempts to confer upon you and your deputy power to investigate alleged violations of the act, and, if satisfied therefrom that any company or its agent has violated the provisions thereof, then to revoke the certificate granted

in behalf of such company, and cause public notice of such revocation to be given.

"It is the desire of this company, while transacting business in the State of Michigan, to comply with and observe the laws thereof.

"The form of the undertaking prepared by you under this act we have executed, and enclose herewith. In executing and transmitting this instrument to you, this company does hereby make and transmit therewith its most earnest protest against the constitutionality of the act in question.

"In executing the annexed agreement this company must not be understood as consenting to the jurisdiction attempted to be conferred upon you by the seventh section of said act, or that the authority of this company to do business in the State of Michigan may be revoked in case you or your deputy should become satisfied that this company is represented by any agent who is violating the provisions of section 3 of said act; and this company, in executing and transmitting the annexed undertaking, does not intend to consent, and shall not be understood as consenting, to all the provisions of said act, or waiving its right to question the validity thereof, should it become necessary hereafter."

This protest was signed by the president and the secretary of the company. The renewal certificate was duly issued to the relator by the Commissioner of Insurance, and the relator continues to do business within this State.

On March 20, 1888, the Commissioner of Insurance served upon the relator the following written notice:

"Messrs. Geo. L. Chase, President, and P. C. Royce, Secretary, Hartford Fire Insurance Company.

"GENTLEMEN: It having come to my knowledge that the Hartford Fire Insurance Company has violated the provisions of section 2 of Act No. 285, Public Acts of Michigan of 1887, by entering into a contract, agreement, or arrangement with the Michigan Rating and Inspection Bureau, the object of which is to prevent open and free competition between the companies doing business in this State, you are hereby notified to appear before me, at my office in Lansing, on Wednesday, the 28th day of March, 1888, at 10 o'clock A. M., to show cause why the certificate of authority to transact busi-

ness in this State, heretofore granted to said company, shall not be revoked as provided for in section 7 of said act.

"Respectfully yours,

"HENRY S. RAYMOND,

"Commissioner of Insurance."

On March 28, 1888, the relator appeared specially before said Commissioner, by Hon. Isaac Marston, its attorney, for the sole and only purpose of objecting to such proceedings for the following reasons:

"The said act is unconstitutional and void—

"1. In that it attempts to confer upon the Commissioner of Insurance, an officer appointed by the Governor, judicial power.

"2. That said act does not provide or point out any way or method of notifying a company interested that an investigation is about to be had under the provisions of section 7.

"3. That said act does not provide for or require any complaint, charge, or specification, informing such company of the way or manner in which it is claimed such company has violated the provisions of said act. or give said company an opportunity to appear and be heard upon such investigation.

"4. That said act deprives said company of its right to a trial by jury, and attempts to deprive it of valuable rights and privileges without due process of law.

"5. That the notice issued in this case does not set forth or contain any charge showing a violation of the act, nor point out with reasonable certainty how or in what manner the said act has been violated by said company."

On the hearing before the Commissioner, on March 28, 1888, the said Commissioner of Insurance produced in evidence a printed circular issued by David Beveridge, the material parts of which are as follows:

"PROSPECTUS.

"The enactment by the Michigan Legislature of a law forbidding such agreements between fire insurance companies as tend to prevent open and free competition, would appear to render necessary some different plan for the conduct of the business. Assuming that the law will be respected by fire underwriters in both its letter and spirit, and it being evident that where each company compelled to employ, in its

own behalf, a person to rate and inspect risks, the result would be that no property-holder could tell from day to day what his rates of insurance would be, and, moreover, that the cost of the conduct of the business would be largely increased, I propose, if a sufficient number of subscribers can be obtained, to open, on January 1, next, an inspection and rating bureau, with headquarters at Detroit, Michigan, to conduct the business contemplated, through branches located at Detroit, Jackson, Kalamazoo, Grand Rapids, Saginaw, and, if the interests of the subscribers shall require it, at other points. In order to accomplish the objects set forth, I propose—

"1. To employ, at each of the branches named, a competent deputy-inspector, who shall be possessed of underwriting skill and knowledge sufficient to fit him for the position. It shall be the duty of each deputy-inspector, under regulations to be established by the proposed 'Inspection and Rating Bureau,' to examine, either by himself or assistants, as often as the interests of the subscribers may require, all classes of risks, to see that proper regulations for the prevention of fires are enforced in mills, lumber-yards, manufactories, theaters, public buildings, etc., and to prepare, when necessary, forms of policies for the different classes of risks, that shall be just to the insurer and the insured.

"2. Each deputy-inspector in the several districts will be required to inspect and rate such risks in his district as need inspecting and rating, the rates made to be on the basis of schedules heretofore approved, and to furnish the rates so fixed to the subscribers and their agents; also to perform such other duties and acts not contrary to law as the interests of the subscribers may require, and as shall secure to them the benefits of the inspections and ratings contemplated. It is proposed that t e ratings shall be made as low as the subscribing companies can, in the judgment of the bureau, safely accept, having reference to cost and a moderate profit. I reserve the right to adopt all existing tariffs as the rates of my bureau, until they are changed by me and changes duly promulgated.

"3. In order to protect each subscriber from the acceptance of unsafe risks and rates, the bureau will adopt regulations applying to the deputy-inspectors and local agents, substantially as. follows: Each subscribing company is to require its agents in the several branch districts to submit to the deputy-inspector of the district all daily reports and

indorsements, and the said inspector will cause to be stamped or written on said daily report the rate approved by the bureau, and shall also verify by his stamp all other documents presented, and mail the same to the subscribers to whom they respectively belong."

The fourth clause of the prospectus provides for the headquarters of the five several branch districts, and the counties included in each branch.

The fifth clause provides for the furnishing from the bureau to subscribers tariffs and schedules for rating risks outside of the districts enumerated.

" 6. No company will receive the rates of the bureau save such as subscribe for them, and agree to withhold them from non-subscribing companies.    In order that subscribers only may enjoy the benefit of the inspections and ratings made at the several branch offices, it will be necessary that each subscriber shall give assurance that he will abstain from furnishing inspections and ratings to any non-subscribing company, and will faithfully require his agents in each of the several districts to conform to the ratings and rules made necessary by the use of the schedules adopted, in order that the permanency of the work to be undertaken may be assured, and paying subscribers retained.    The faithful observance of this clause I consider absolutely essential for my own protection. Should non-subscribing companies have the benefit of the information which this bureau proposes to furnish its subscribers, or subscribing companies be permitted to discredit the ratings of this bureau by a failure to observe the same, the result in either case would inevitably be a pecuniary loss to me, and would ultimately result in the destruction of the bureau."

The seventh clause provides the compensation to be paid for the services rendered by the bureau at $4,000 per year, to which is to be added all necessary expenses in conducting the bureau and its branches; these amounts so to be paid, to be apportioned among the subscribing companies as the net premiums received by each shall bear to the net premiums received by all; and, in order to meet the immediate expenses of the bureau, each company, at the time of subscribing, is

to pay $25, and to be credited therewith on its first assessment. Any company subscribing may withdraw from the bureau upon giving 30 days' notice of its intention so to do, and payment of dues to date, and the bureau reserves the right to terminate the contract with any company whose use of facilities thus extended may be deemed detrimental to the interests of the bureau.

It is then added:

"I wish to add that, in the event of your becoming a subscriber under the foregoing arrangement, I will undertake to provide that the persons employed as deputy-inspectors at the branch offices shall be satisfactory to the subscribers, and that should any considerable number of the subscribers become dissatisfied with any inspector, on account of his incompetency or unfitness for the position, he shall be displaced within 30 days of the date of notice received from one-fourth of the subscribers that such dissatisfaction exists, and a new appointee, fitted for the position, be installed in place of such displaced inspector. It is proper to add that the outlines of the preceding plan have been placed before learned counsel, its general features considered, and it is pronounced free from objections so far as being an infringement upon the law of the State heretofore referred to is concerned.

"Sincerely,

"DAVID BEVERIDGE.

"*Detroit, November 29, 1887.*"

Said Commissioner also produced an agreement on the part of the relator with said David Beveridge, by which it appears that relator became a subscriber to the Beveridge plan as follows:

"CHICAGO, December 1, 1837.

"To DAVID BEVERIDGE: The Hartford Fire Insurance Company, of Hartford, Conn., having carefully examined the prospectus issued by you of an inspection and rating bureau in the State of Michigan, a copy of which is hereto attached, and made a part hereof, does hereby become a subscriber thereto, and agrees to pay you as in said prospectus stated, and to observe each and every of the terms thereof,

so long as the same are observed by you and this company remains a subscriber thereto.

"G. F. BISSELL, General Agent."

It was admitted by the attorney of the relator, before and to said Commissioner of Insurance, that said relator executed and delivered the foregoing agreement to said David Beveridge. Said attorney further admitted to said Commissioner of Insurance that said Hartford Fire Insurance Company had become a subscriber to Mr. Beveridge's plan according to said prospectus and agreement, on December 1, 1887, and has continued so to be from thence hitherto.

It was agreed between the said Commissioner and the attorney for said company that the agents for said company in the State of Michigan have not entered into any agreement with agents of other companies or associations in violation of the provisions of Act No. 285, Laws of 1887, so far as is known to said Commissioner, except as may appear from the exhibits and papers referred to herein.

The relator then introduced in evidence before said Commissioner a circular letter issued by it on January 16, 1888, as follows:

"HARTFORD FIRE INS. CO., WESTERN DEPARTMENT.

"CHICAGO, January 16, 1888.

"To AGENTS IN MICHIGAN.

"*Gentlemen:* We have received inquiries from a considerable number of our agents in regard to the course they and we are to pursue under the operation of what is known as the 'Cole Law,' passed at the last session of your Legislature, intended to prevent insurance companies and agents from co-operating in any manner in the regulation of business, and which goes into effect on the first proximo. While we can entertain no respect for a law so iniquitous in its inception and so unjust in its provisions as we regard this to be, so long as it is in force we expect to observe it ourselves, and to ask our agents to do the same.

"After February 1 it will not ,be lawful for you (in the language of the law) to enter into any 'contract' or 'agree-

ment' with other agents or associations, 'the object or effect of which is to prevent open and free competition,'—whatever this may mean. The operation of this law will make certain changes in our business seem expedient. All agreements to observe compact rates will be suspended from and after the date named.

"We wish to add, however, that, so far as this company is concerned, we do not expect to tolerate any reduction in rates by reason of these changes. The rates of insurance in Michigan, considering the oppressive tax levied by the State, and the arbitrary provisions imposed upon the business, are already much too low. No concession in the rate last accepted will be made, except for improvements which render the risk safer.

"The system of rules and inspections heretofore employed through compact managers being, under the new law, of questionable permissibility, our business in special hazards will be materially curtailed. Furniture factories will hereafter be wholly declined in your State. No saw-mill risks will be accepted, except those provided with brick or stone furnace-rooms, and first-class appliances for extinguishing fires. Wood-working establishments generally will be declined except at materially advanced rates, and after submission of full surveys.

"We shall require in all cases the enforcement of the space and four-fifths clause now in use, in case of insurance on lumber, or decline the business. Flouring-mills will, under no circumstances, be accepted at less than the schedule rates heretofore in force.

"We shall hope to place in your hands at an early day printed tariffs by which the business of this office will be governed without reference to rates offered by other companies. We shall also expect to avail ourselves of such other methods for protecting our interests, not contrary to law, as may occur to us in the future.

"These changes will make it necessary for us to impose some new burdens upon our agents in respect to surveying risks and reporting fuller information concerning them, which we trust they will cheerfully endure. Agents will please understand that rules relating to commissions paid by this company, or by other companies associated with us in the same agency, are in no manner affected by the new law, and remain unchanged.

"You are asked to preserve this circular, and, for your own

protection and ours, be governed by our instructions in the matters referred to.      Yours very truly,

       " G. F. BISSELL,
          " General Agent."

Upon the production in evidence before the said Commissioner of the agreement and protest and renewal certificate heretofore set forth, it was agreed and admitted by said Commissioner that, at the time said renewal certificate so issued, the relator paid to the State of Michigan the sum of $3,222.94 as a tax upon its business for the preceding year.

Relator then produced in evidence before said Commissioner the following circular letter issued by its general agent to its general agent in Michigan on February 7, 1888:

         "CHICAGO, February 7, 1888.
" GEO. W. CHANDLER, Agent,
       "Detroit, Mich.,

*" Dear Sir:* Referring to our circular of January 16, in relation to matters in your State, we beg to notify you that we have become subscribers to the Michigan Inspection and Rating Bureau, which has been opened at Detroit by Mr. David Beveridge, who proposes to rate and inspect various risks in your State through his own bureau at Detroit, and through bureaus under deputy-inspectors in different parts of the State.

"Under the arrangement we make, our daily reports will be furnished to deputy-inspectors before being sent to this office. The inspectors will stamp the rate fixed by the bureau thereon, and forward them to us.

"We have to request, therefore, that you will direct your reports to the Michigan Inspection and Rating Bureau at Detroit, from and after the date of the receipt of this letter.
       "Yours very truly,

         "G. F. BISSELL,
          " General Agent."

This was all the evidence offered before the Commissioner of Insurance by either party.

On April 2, 1888, the Commissioner of Insurance made an order revoking the certificate issued to relator authorizing it to do business in this State, and is about to cause notice of

said revocation to be published in some newspaper of general circulation in this State once in each week for four weeks in pursuance of said act of 1887.

The relator claims that said order of revocation, and the publication of notice thereof, will destroy its business in this State, and prevent it from continuing said business, the premiums from which, received by it annually from this State, amount to the sum of $100,000; that it will suffer irreparable injury if said order is enforced and published as aforesaid; and that relator is without remedy unless this Court will interfere by *mandamus*.

Counsel for relator claim that, conceding all the provisions of this act to be valid, the Commissioner had no right or authority to revoke its renewal certificate, for the reason that the adoption of the Beveridge plan by the relator was not a violation of the act of 1887, as it was not a contract or agreement entered into by it with any other company or association.

"That Beveridge, recognizing the opening created by this new law, on his individual account, and not acting as the agent of any company, develops a plan similar in character to a mercantile or commercial agency, like Bradstreet's or Dun's, by which trained corps of inspectors shall investigate all the buildings in Michigan, and report as to the 'fire risk' connected with them, in much the same way that Dun's men report concerning the credit or 'bankruptcy risks' of a tradesman. This information is sold to the persons interested in knowing it, viz., the fire insurance companies contemplating writing policies on the buildings reported. For his own protection, and acting in precisely the same way that Dun or Bradstreet acts, he requires each company becoming a subscriber to agree to certain requirements and rules; each company, acting for itself, and entirely independent of other companies, subscribes thereto."

Counsel for relator say further:

"It is doubtless true that the effect of subscribing to this plan may, when more than one company subscribes, tend to impair competition between such companies. But this is

70 MICH. 32.

not enough. No one can say that, should one company alone accept Beveridge's rates, and instruct its agents not to vary therefrom, this would be a violation of the act. Why, then, should the fact that another company, acting independently of the first, subscribes to the same plan, make the first liable? The first subscription is legal; can the second, although without the knowledge or consent of the first, make the first amenable to the penalties of this act?"

There can be but one answer to this question. The obvious purpose of the Beveridge prospectus is to draw together all foreign insurance companies doing business in this State, and unite them upon uniform and fixed rates of insurance, and from which no one of them might depart after becoming a subscriber thereto. The intent of Mr. Beveridge undoubtedly is to make a place of profit for himself as the head of a rating and inspection bureau. The *effect* of the whole plan is to evade the provisions of the act of 1887, if an insurance company is permitted to do indirectly what the statute positively prohibits.

It will not do to say that, when a foreign insurance company becomes a subscriber to this plan, Mr. Beveridge and his deputies are not its agents. The prospectus itself provides that the plan is to be carried forward—

" If a sufficient number of subscribers can be obtained,"—

And each subscriber, by its terms, is—

" To require its agents in the several branch districts to submit to the deputy-inspector of the district all daily reports and indorsements, and the said inspector will cause to be stamped or written on said daily reports the *rate approved by the bureau.*"

Also, in the prospectus, Mr. Beveridge says:

" I reserve the right to adopt all existing tariffs as the rates of my bureau until they are *changed by me.*"

In other words, Mr. Beveridge says:

" Here is my plan. If a sufficient number of the foreign insurance companies will subscribe to it so that they can

afford to pay my charges and expenses, and agree to abide by the rates I may fix, and not depart from them, and pass all papers through my hands for approval, a uniform rate of insurance can be obtained by the companies in this State. No cutting of rates will be indulged in, and there will be no competition between such companies in Michigan."

It will at once be seen that this is but a renewal of the old compact system under a very transparent disguise, and an attempt to carry out a plan which the law was enacted to prohibit. In fact, counsel for relator admits, upon the argument here, that the purpose of Mr. Beveridge in his prospectus was to perfect a plan by which foreign insurance companies might arrange a uniform rate of insurance.

It is claimed that this act runs counter to the provisions of Article 4, § 20, of the Constitution of the State of Michigan, which declares that—

"No law shall embrace more than one object, which shall be expressed in its title."

This provision requires that the title shall fairly indicate the general object of the law. *People v. Hurlbut*, 24 Mich. 44; *Stockle v. Silsbee*, 41 Id. 615 (2 N. W. Rep. 900). The title of this act is—

"An act to regulate the manner in which insurance companies not organized under the laws of this State, but doing business within it, shall transact their business."

It is not very seriously contended that, under the title of an act to prohibit or regulate a certain business, a failure to embody in such title a statement that it is also for the purpose of punishing violators of the law renders it invalid. An act to regulate a business must of necessity visit some form of punishment or penalty for violations of its provisions, as the penalty is the only lever that could give practical effect to the law.

The title to Act No. 313, Laws of 1887, known as the "Liquor Law," came before this Court in *Robison v. Miner*, 68 Mich.

549 (37 N. W. Rep. 21), and was held valid. There was nothing in the title of this act to indicate the penalties to follow violations of this act.

Counsel for relator cite the case of *People v. Beadle,* 60 Mich. 22 (26 N. W. Rep. 800), as in point. In that case, under a title to regulate the sale of liquor, it was held improper to embody a provision punishing persons for being intoxicated in public assemblies. That case has no application to the present. Here the act is to regulate, and prescribes a penalty for violation of the regulations provided by the act. The object is sufficiently stated in its title.

The law regulating the manner in which foreign insurance companies may do business within this State is not new upon our statute books. In 1855 an act was passed having reference to foreign insurance companies; and in 1859, by Act No. 248 of that year, amendments were added to the statute of 1855, providing for examination and license of insurance companies by the Secretary of State, and requiring them, by resolution under seal, to appoint an agent in this State upon whom process might be served, and providing that no company incorporated in any other state shall transact any business in this State unless such company is possessed of $100,000 of actual capital invested in stocks, etc., the market value of which shall not be less than $100,000, etc. The law of 1859, p. 1049, added to the requirements of the law of 1855 a provision for examination and license by the Secretary of State of such insurance companies.

Act No. 51, Laws of 1871, prohibits such companies from doing business in this State, until such statements as the law provides are filed, and receiving from the Secretary of State the necessary certificate of authority. How. Stat. § 4200. And it appearing to the Secretary of State that the assets of the company are not such as to justify its continuance in business, and that its affairs are in an unsound condition, he was required to revoke such certificate of authority. How. Stat.

§ 4295. Act No. 108, Laws of 1871, created the insurance bureau, and provided for the office of Commissioner of Insurance, conferring upon him all the duties and powers before vested in the Secretary of State. The law relating to life, accident, and co-operative insurance has followed substantially in the same channel as that relating to fire and marine insurance. *People v. Howard,* 50 Mich. 240 (15 N. W. Rep. 101).

At the end of each year each company is to make a statement of its business for such year, and pay a tax of 3 per cent. upon its gross receipts, which amount may be recovered at the suit of the State from any company neglecting to pay. How. Stat. § 4301.

It is contended by the relator that the authority granted to foreign insurance corporations to do business in this State is a valuable right, in the nature of and equivalent to a corporate franchise, and within the protection of constitutional safeguards; and that the act is unconstitutional and void because it deprives the relator of these valuable rights and privileges without due process of law.

Corporations organized under the laws of other states, to engage in and carry on business not open to citizens generally, cannot carry on business in this State, except permission, either express or implied, is given them to do so. All foreign insurance companies, however formed or created, associations or corporations, cannot, directly or indirectly, take any fire risks or transact any business within this State, unless authorized so to do by the Commissioner of Insurance. It has been repeatedly held, and there seems to be no conflict of authority, that corporations of one state have no right to exercise their franchises in another state except upon the assent of such other state, and upon such terms as may be imposed by the state where their business is to be done. The conditions imposed may be reasonable or unreasonable; they are absolutely within the discretion of the legislature. *Ins.*

*Co. v. Davis*, 29 Mich. 238; *People v. Howard*, 50 Id. 240 (15 N. W. Rep. 101); *Ins. Co. v. Stoy*, 41 Id. 385 (1 N. W. Rep. 877); *Ins. Co. v. Judge*, 21 Id. 578; *Bank v. Earle*, 13 Pet. 519; *Paul v. Virginia*, 8 Wall. 168; *Doyle v. Ins. Co.*, 94 U. S. 535; *State v. Doyle*, 40 Wis. 186; *Ins. Co. v. French*, 18 How. 404; *Draw-bridge Co. v. Shepherd*, 20 Id. 227; *Carroll v. East St. Louis*, 67 Ill. 568; *Ducat v. Chicago*, 10 Wall. 410; *Ins. Co. v. Mass.*, Id. 566; *Osborne v. Mobile*, 16 Id. 479; *Rector v. Philadelphia*, 24 How. 300; *Walker v. Springfield*, 94 Ill. 364; Mor. Priv. Corp. §§ 971, 974; *Ins. Co. v. Harvey*, 11 Wis. 394; *Ins. Co. v. Welch*, 29 Kan. 672; *Ins. Co. v. Wright*, 55 Vt. 526.

In *Association v. New York*, 119 U. S. 110 (7 Supt. Ct. Rep. 108), Mr. Justice Blatchford quoted with approval the language of Mr. Justice Field, in *Paul v Virginia*, 8 Wall. 168. Mr. Justice Field, in speaking of foreign corporations, says:

" Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely, they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interests. The whole matter rests in their discretion."

And in the same case Mr. Justice Blatchford, in speaking further of the principles laid down in *Paul v. Virginia*, says:

" The view announced was that corporations are not citizens within the clause of the Constitution of the United States which provides that 'citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states.'   *   *   *   A corporation created by a state is a mere creation of local law; even the recognition of its existence by other states, and the enforcement of its contracts made therein, depend purely on the comity of those

states,—a comity which is never extended where the existence of the corporation or the exercise of its powers is 'prejudicial to their interests or repugnant to their policy.' "

This same principle was stated by Mr. Justice CAMPBELL, in *Ins. Co. v. Davis*, 29 Mich. 238.

It is claimed by counsel for relator that the case of *Doyle v. Ins. Co., supra,* is overruled or explained in the case of *Barron v. Burnside*, 121 U. S. 199 (7 Supt. Ct. Rep. 931). In that case Mr. Justice Blatchford says:

" The case of *Doyle v. Ins. Co.*, 94 U. S. 535, is relied on by the defendant in error.   In that case this Court said that it had carefully reviewed its decision in *Ins. Co. v. Morse*, 20 Wall. 445, and was satisfied with it.   In referring to the second conclusion in *Ins. Co. v. Morse* above recited, namely, that the statute of Wisconsin was repugnant to the Constitution of the United States, and was illegal and void, the Court said in *Doyle v. Ins. Co.*, that it referred to that portion of the statute which required a stipulation not to transfer causes to the courts of the United States.   In that case, which arose under the same statute of Wisconsin, the foreign insurance company had complied with the statute, and had filed an agreement not to remove suits into the federal courts, and had received a license to do business in the state.   Afterwards it removed into the federal court a suit brought against it in a state court of Wisconsin.   The state authorities threatening to revoke the license, the company filed a bill in the circuit court of the United States, praying for an injunction to restrain the revoking of the license.   A temporary injunction was granted.   The defendant demurred to the bill. The demurrer was overruled.   A decree was entered making the injunction perpetual, and the defendant appealed to this Court.   This Court reversed the decree and dismissed the bill. The point of the decision seems to have been that, as the state had granted the license, its officers would not be restrained by injunction by a court of the United States from withdrawing it.   All that there is in the case beyond this, and all that is said in the opinion which appears to be in conflict with the adjudication in *Ins. Co. v. Morse*, must be regarded as not in judgment.

"In both of the cases referred to the foreign corporation had made the agreement not to remove into the federal court suits to be brought against it in the state court.   In the

present case no such agreement has been made, but the locomotive engineer is arrested for acting as such, in the employment of the corporation, because it has refused to stipulate that it will not remove into the federal court suits brought against it in the state court, as a condition of obtaining a permit, and consequently has not obtained such permit."

The case was ruled by the case of *Ins. Co. v. Morse,* 20 Wall. 445; and the Court in *Barron v. Burnside,* 121 U. S. 199, reviewing the facts and rulings of the Court in that case, say that—

"The Home Insurance Company, a New York corporation, filed the appointment of an agent containing the following clause: 'And said company agrees that suits commenced in the state courts of Wisconsin shall not be removed by the acts of said company into the United States circuit or federal courts.' A loss having occurred on a policy issued by the company, it was sued in a court of the state. It filed its petition in proper form for the removal of the suit into the federal court. The state court refused to allow the removal, and after a trial gave a judgment for the plaintiff, which was affirmed by the supreme court of Wisconsin. The company brought the case into this Court, which held these propositions:

"1. The agreement made by the company was not one which would bind it without reference to the statute.

"2. The agreement acquired no validity from the statute.

"The general proposition was maintained that agreements in advance to oust the courts of jurisdiction conferred by law are illegal and void, and that while the right to remove a suit might be waived, or its exercise omitted in each recurring case, a party could not bind himself in advance by an agreement, which might be specifically enforced, thus to forfeit his rights, at all times and on all occasions, whenever the case might be presented.

"In regard to the second question, the proposition laid down was that the jurisdiction of the federal courts under Article 3, § 2, of the Constitution, depends upon and is regulated by the laws of the United States; that state legislation cannot confer jurisdiction upon the federal courts, nor limit or restrict the authority given to them by Congress in pursuance of the Constitution; and that a corporation is a citizen of the state by which it is created, and in which its prin-

cipal place of business is situated, so far as its right to sue and be sued in the federal courts is concerned, and within the clause of the Constitution extending the jurisdiction of the federal courts to controversies between citizens of different states.

" The conclusions of the court were summed up thus:

" 1 The Constitution of the United States secures to citizens of another state than that in which suit is brought an absolute right to remove their cases into the federal court upon compliance with the terms of the removal statute.

" 2. The statute of Wisconsin is an obstruction to this right, is repugnant to the Constitution of the United States and the laws made in pursuance thereof, and is illegal and void.

" 3. The agreement of the insurance company derives no support from an unconstitutional statute, and is void, as it would be had no such statute been passed.

" For these reasons the judgment of the supreme court of Wisconsin was reversed, and it was directed that the prayer of the petition for removal should be granted."

We have thus carefully reviewed the cases cited by counsel for relator, that the distinction might be seen between those cases and the present case. Here the writ of *mandamus* is asked to compel the Commissioner of Insurance to set aside an order made by him in compliance and in accordance with the provisions of the statute before cited, revoking the license granted by him as such Commissioner to the relator to do business within this State. The statute required the insurance company to enter into an agreement—

" That it will not directly or indirectly enter into any contract, agreement, arrangement, or undertaking, of any nature or kind whatever, with any other company, companies, association, or associations, the object or effect of which is to prevent open and free competition between it and said company, companies, association, or associations, or the agent of their respective companies or associations, in the business transacted in this State or any part thereof."

This agreement, arrangement, and undertaking was entered into by the relator in the form hereinbefore set forth. The Commissioner of Insurance, upon an investigation and hearing before him, and of which the relator had due notice, and

actually appeared by its counsel before the Commissioner, found that the relator had adopted the Beveridge plan, and that its methods of doing business within this State was in pursuance of such plan; in fact, the relator confesses itself a subscriber thereto. From these facts appearing upon the face of the Beveridge plan, the Commissioner of Insurance found that the relator was pursuing its business in this State in violation of this statute, and in violation of its agreement entered into, and in pursuance of which the license was granted it to do business within this State, and in this we think the Commissioner was correct, and properly revoked the license of the relator to do business within this State.

This agreement, which this statute provides for, is one which the Legislature has the power to prescribe as one of the conditions upon which a foreign corporation may do business within this State, and this does not fall within the ruling of the Supreme Court of the United States in *Barron v. Burnside, supra.* In the case of *Doyle v. Ins. Co., supra,* the Supreme Court of the United States expressly refused to allow injunction to restrain the revoking of the license issued to the Continental Insurance Company, and this doctrine was approved in *Barron v. Burnside.*

It is claimed, however, that the act is unconstitutional because it attempts to confer judicial power on the Commissioner of Insurance, who is a member of the executive department of the State government, and that the act attempts to confer summary and arbitrary power upon such Commissioner to revoke the authority to do business within this State. The power of the Commissioner, however, under this act, to grant a license or to revoke it, is but ministerial in its nature, and not the exercise of judicial functions. The Commissioner, upon certain facts being made to appear to him, is authorized to issue the license, and, upon certain other facts being made to appear, he is required to revoke it. This is a common condition of ministerial duty.

As we have before seen from a long line of decisions, it is for the Legislature alone to say whether or not a foreign corporation shall have license to act within this State, and, if so, on what terms and conditions such license shall be granted, and also determine for what causes such license may be revoked. In *Tomlinson v. Jessup*, 15 Wall. 454, the Court say:

"A license to a foreign corporation to enter a state does not involve a permanent right to remain."

This principle has been expressly recognized by this Court. *Ins. Co. v. Davis*, 29 Mich. 238; *Ins. Co. v. Judge*, 21 Id. 578; *Ins. Co. v. Stoy*, 41 Id. 385 (1 N. W. Rep. 877).

In the case of *Insurance Co. v. Stoy, supra*, the Court said:

"Foreign and domestic companies are treated alike in this respect under our laws; both must submit to the Commissioner's inspection, and he may revoke the authority of either. * * * We must take this record as we find it, and cannot question or inquire into the Commissioner's reasons for what he did, or whether he was justified or not, nor have we the means of so doing."

It appears from the record in the case that the Commissioner of Insurance gave the relator a full and fair opportunity to be heard before making his order revoking its license, and we think the relator has no reason to complain of the action taken. It is attempting to pursue its business in this State in a manner prohibited by law, under a scheme prepared for the purpose of securing the same result as the old arrangement, which was sought to be controlled and regulated by the act of 1887. This law is valid, and the revocation of relator's license for such reason obligatory and authorized.

*Mandamus* is not a writ of right, and this Court does not feel inclined to aid a wrong-doer in setting at defiance the laws of the State.

The writ must be denied.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred. CAMPBELL, J., did not sit.