[Montgomery Mutual Building and Loan Assoc. v. Robinson.]

# Montgomery Mutual Building and Loan Association *v.* Robinson.

*Bill in Equity to enjoin Sale under Power in a Mortgage, and for an Account and Redemption.*

1. *Constitutional provisions; rule of construction.*—In the construction. of constitutional provisions prescribing rules of legislative procedure, the observance of which is essential to the validity of legislative enactments, the courts keep steadily in·view the purposes of their adoption,. and avoid a closeness of construction which would tend to embarrass legislation.

2. *Second clause of second section of fourth article of constitution of 1865, construed.*—The second clause of the second section of the fourth article of the constitution of 1865, providing that " each law shall em-* brace but one subject, which shall be described in the title," was not directed against the generality and comprehensiveness of titles to legislative enactments; but against combining several projects or subjects, having no proper relation to each other, in one bill, of which the title· gave no intimation.

3. *Same; the act incorporating The Montgomery Mutual Building and Loan Association, not violative of.*—The act of the General Assembly entitled " An act to incorporate " The Montgomery Mutual Building and. Loan Association," approved February 11th, 1867 (Pam. Acts, 1866–7, p. 408), had but one subject, which the title with clearness indicates, though it may not indicate the objects the corporation is designed to accomplish, or the powers with which it is to be invested, or the agency to be employed, or the mode to be pursued in exercising the powers. .These are incidents necessarily pertaining to corporate existence—parts of the general subject expressed in the title. This act did not, therefore, offend such constitutional provision.

4. *Usury; a transaction sanctioned by the General Assembly can not be usurious.*—The General Assembly ordained the statute against usury, and its power to designate the transactions which shall be deemed offensive to, or which shall be excepted from the influence of the statute, can not be questioned. When that body lends express sanction to a particular transaction, that transaction is withdrawn, and excepted from the operation of the statute.

5. *Same; when transaction not usurious.*—Where, by act of the General Assembly incorporating a building and loan association, authority was given to expose to sale, at each monthly meeting of the association, the amount paid into the treasury, at public outcry to the highest bidder among the members, each of whom was authorized, for each and every share of stock held by him, to purchase an advance of two hundred dollars and no more ; and the stockholder purchasing such loan or advance, was thereby required to allow the premium at which he bid in such advance or loan, to be deducted, and to give his note for the amount of such advance, and to pay, in addition to the monthly dues required from all members, one dollar and thirty-three and one-third cents per month for each share of stock, or at the rate of eight per cent. *per*

*annum*, on the whole amount, including the premium,—such a transaction, having legislative sanction, is free from usury.

6. *Building and loan association; provisions of charter construed.*—Under a provision in the charter of a building and loan association, enacted by the General Assembly, that, in the event of the death of a stockholder, who had obtained an advance, his heirs or legal representatives were entitled to continue the relation of stockholder, the death of a member operates a dissolution of his membership, terminating his connection with the association; and upon his heirs or devisees, and not upon his personal representative, is conferred the privilege of succeeding to, or continuing the membership. And if such privilege is exercised by the heirs or devisees, they become members, not in a representative capacity, but in their own right; and they are subject individually to the duties and liabilities of membership.

7. *Same.*—Where the charter of such association further provides that, if the heirs or devisees were unable or unwilling to continue the membership of a deceased stockholder, who had obtained a loan or advance, the association is required to act as if default had occurred while the stockholder was living, and it also provides that a stockholder may redeem his property mortgaged to secure such loan or advance, by payment of such a sum of money as would, at the rate of premium at which the corporate funds were selling at the time of redemption, produce the same monthly interest as that which the stockholder had been paying on the advance, in no event being less than the net sum advanced,—the association can not neglect or delay indefinitely the foreclosure of the mortgage, and thus suffer dues, interest and fines to accumulate, increasing the mortgage debt and burdening the equity of redemption; but it must proceed to a foreclosure of the mortgage.

8. *Same.*—In such case, the liability of the mortgaged premises is the same amount that could have been demanded of the decedent, if, at the instant of his death, he had offered to redeem.

APPEAL from Montgomery Chancery Court.

Heard before Hon. H. AUSTILL.

On the 20th July, 1869, John Lawler, at that time holding and owning ten shares of the stock of The Montgomery Mutual Building and Loan Association, a corporation created by a special act of the General Assembly, purchased, under the provisions of the charter of the association, an advance or loan of $2,000 on his ten shares, for which he gave his note, and executed a mortgage on real estate in the city of Montgomery securing the same, with power of sale. The amount of money which he actually received on the advance or loan, was $915, the balance being the premium offered by him, which was deducted from the loan. Lawler died in October, 1870, at which time he was not in default to the association, and after his death payments were made to the association by his personal representative, which were applied to dues and monthly interest on the theory that Lawler's membership still continued. Lawler's estate was insolvent, and was so declared by the probate court having the jurisdiction thereof; and William T. Hatchett was appointed the administrator of said estate. Said association having advertised the property conveyed by the mortgage for sale under the power contained therein, Patrick Robinson, as a

[Montgomery Mutual Building and Loan Assoc. v. Robinson.]

judgment creditor of said estate, filed the original bill in this cause, on 21st February, 1874, against the association, and said administrator, charging that said loan was usurious, that payments had been made thereon which had been applied by the association to illegal charges, and that the association was claiming more than was due, and seeking an injunction, an account of the amount due to the association on such loan, a sale of the property conveyed by the mortgage under the decree of the court, and an application of the proceeds, after paying whatever balance that might be due to the association under the mortgage to the payment of Lawler's debts. Hatchett, as administrator, answered the bill, admitting its allegations to be true ; and afterwards filed a cross bill, making the same case, and seeking substantially the same relief, as was made and sought in the original bill. The association demurred to both the original and cross bills, and its demurrers having been overruled, it answered, denying the usury and the other averments of the bills, upon which the equities thereof rested. On final hearing, had upon pleadings and proof, the Chancery Court declared the loan usurious, ordered an account of the balance due, directed the application of payments, and decreed a sale of the property conveyed by the mortgage, and the proceeds, after the payment of the balance due on the loan, to be paid over to the complainant in the cross bill. From this decree the association and Hatchett, as administrator, appealed ; and by agreement of parties, under the rule, errors were assigned by both parties on the same record. The statement in the opinion of facts and of the questions submitted for decision, renders it unnecessary to set out the assignments of error, or to state more in detail the case presented by the record.

DAVID CLOPTON, for appellant.

SAYRE & GRAVES, contra.

BRICKELL, C. J.—By agreement, the parties have waived all other than three of the questions the assignment of errors is supposed to involve. These questions are thus stated in the agreement: 1. Whether there was usury in the transaction between John Lawler and the Building and Loan Association, out of which the note and mortgage arose, *having been made in accordance with the constitution of the association.* 2. Upon what principles, and in what way, must the amount legally due upon the mortgage be ascertained. 3. The constitutionality of the act of incorporation, and if unconstitutional, what effect it has upon the transaction.

The association was incorporated by a special act of the Gen-

eral Assembly, approved February 11th, 1867 (Pamph. Acts, 1866–7, pp. 408–16), entitled "An act to incorporate The Montgomery Mutual Building and Loan Association." The first section, nominating particular persons, declares they are created a body corporate and politic, by the name of "The Montgomery Mutual Building and Loan Association," and by that name could sue and be sued, contract and be contracted with, acquire, hold and convey real estate or other property, make rules, regulations and by-laws, not inconsistent with the constitutions and laws of the United States or of this State, and to do any act necessary to carry into effect the constitution of the association, which is embodied in the act. The constitution consists of eleven articles declaratory of the objects of the association, defining the rights and liabilities of its members, providing specially for the management, loan or investment of the corporate funds, and prescribing the number, duties and powers of its officers. The second, third and fourth sections relate to the opening of the books for subscription to stock, the allotment of shares, and the election of officers.

This enactment, it is insisted, offends the second clause of the second section of the fourth article of the constitution of 1865, of force at the time of its passage by the General Assembly, which declared: "Each law shall embrace but one subject, which shall be described in the title." The objection resolves itself into two inquiries—is the subject of the act single, and described in the title; and does the act in its provisions conform to the single subject expressed or described. The clause of the constitution of 1865, under consideration, was borrowed literally from the constitution of 1861, when for the first time it made its appearance in the fundamental law of the State. In phraseology it differs from the present constitution, and from that of 1868, declaring: "Each law shall *contain* but one subject, which shall be *clearly expressed in its title*." The difference in phraseology has not caused any change or difference of construction; each clause being deemed significant of the same purposes and objects, and each having the same operation. In the construction of this and similar constitutional provisions, prescribing rules of legislative procedure, the observance of which is essential to the validity of legislative enactments, the courts have kept steadily in view the purposes of their adoption, and have avoided a closeness of construction tending to embarrass legislation. It has been often said in this court, repeating the words of other courts, that this clause of the constitution is intended to accomplish but one purpose, the suppression of a practice which had been too prevalent, leading at times to unfortunate, if not corrupt legislation, by which several projects or subjects, having no proper relation to each other, were combined in one

bill, and the supporters of each *assisted* in passing all into law; or, clauses were inserted, of which the title gave no intimation; and the prevention of the deception of the legislature, and the people, by concealing under alluring titles legislation which, if its real character had been disclosed, would have been condemned. "There was no design by this clause," say the Supreme Court of Michigan, "to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, and thus multiplying their number; but the framers of the constitution meant to put an end to legislation of the vicious character referred to, which was little less than a fraud upon the public, and to require that in every case the proposed measure should stand upon its own merits, and that the legislature should be fairly satisfied of its design, when required to pass upon it." *People v. Mahaney*, 13 Mich. 481. It is not directed against the generality or comprehensiveness of the titles to legislative enactments. In *Ex parte Pollard*, 40 Ala. 99, where the construction and operation of the clause was first drawn under the consideration of this court, said Chief-Justice WALKER: "The evil contemplated was not the generality and comprehensiveness of titles. These faults do not tend to mislead or deceive. . . . . The particular subject selected by the legislature, and put in the title, must embrace every part of the law. The question must always be, whether, taking from the title the subject, we can find any thing in the bill which can not be referred to that subject. If we do, the law embraces a subject not described in the title. But this conclusion should never be attained, except by argument characterized by liberality of construction and freedom from all nice verbal criticism." No statute having but one general object, reasonably and fairly indicated by its title, has been condemned because of the generality of the terms of the title. Whatever provisions that have, by fair intendment, a necessary or proper connection with the subject expressed in the title, may be introduced into the body of the enactment. When the generality of the title is not made a cover for legislation incongruous to, or diverse from, the subject expressed, the spirit and purposes of the constitution are satisfied.—Cooley, Cons. Lim. 172–78.

The title of this enactment describes as its subject the incorporation, the formation of a body politic, having the name and style of "The Montgomery Mutual Building and Loan Association." The subject is single—the title with clearness indicates it, though it may not indicate the objects the incorporation, the body politic, is designed to accomplish, nor the powers with which it is to be invested, nor the agency to be employed, nor the mode to be pursued in exercising the powers. These are incidents of necessity pertaining to corporate exis-

[Montgomery Mutual Building and Loan Assoc. v. Robinson.]

tence—parts of the general subject expressed in the title.—*Sun Mutual Ins. Co. v. Mayor*, 4 Selden, 247 ; *Brewster v. City of Syracuse*, 19 N. Y. 116. It is not intended that the body of a legislative enactment shall be a repetition of the title, nor that the title shall be a summary or epitome of the body. The expression in the title, as is expressed in this title, of the actual subject to which the body of the act is devoted, is all that is required. The objection urged to this enactment is very far-reaching, and, if sustained, would sentence to nullity innumerable legislative enactments. When the creation of private corporations rested within legislative province, they were invariably created by special statutes, having titles, declaring the subject to be an incorporation of a particular name and style. Many such enactments, having such titles, were passed at the same session of the General Assemby, at which this statute was passed. These, though corporate existence under them has been established, corporate powers exercised, property and rights acquired, liabilities incurred, and for fifteen years their validity unquestioned, if the objection now urged were sustained, would be blotted from the statute book. The degree of particularity which must be observed in the expression of the subject in the title of a legislative enactment, must rest largely in legislative discretion. The duty of the General Assembly is met, when the title draws attention directly to the subject. Building and loan associations or societies have existed so long, their organization as corporations under general laws, or special legislative enactments, has been so frequent, that it may well be doubted, whether a more appropriate title could be selected for a special enactment of incorporation, a title more expressive of the subject of the enactment, than the title given to this statute. The idea at once suggested is, that the purpose of the corporation will be the accumulation of funds for division among the members, the investment of such funds until the appointed period of division, and enabling its members to obtain by anticipation, on such terms as may be prescribed, the proportion to which on division it is contemplated they will be entitled to receive. This is the subject of the present enactment, and all the provisions introduced into it, relate immediately to this subject.

The eighth article of the constitution entitles each stockholder, for each and every share of stock he may hold in the association, to purchase an advance of stock of two hundred dollars, and no more. The mode of obtaining the advance is prescribed. At each monthly meeting of the association, the amount paid into the treasury was to be exposed to sale at public outcry to the highest bidder among the members. The stockholder taking the advance allowed the premium he had

[Montgomery Mutual Building and Loan Assoc. v. Robinson.]

offered to be deducted, giving a note for the advance, secured by mortgage on real estate, equal in value to the net sum advanced, with power of sale; assigning also as collateral security, one share of stock in the association for each two hundred dollars of the advance. He was required to pay, in addition to the monthly dues required from all members, one dollar and thirty-three and one-third cents for each share of the stock, or at the rate of eight per cent. *per annum* on the whole amount, including the premium. If he failed in the payment of this monthly interest, he was subject to the same fines thereon, as for a default in the payment of other dues, which was ten cents per month for every dollar remaining unpaid, the fines continuing every month of the default. If for three successive months there was a neglect to pay any or all dues to the association, a foreclosure of the mortgage was authorized. From the proceeds of the sale of the mortgaged property, the association was authorized to retain and apply so much of the purchase-money as would be required to redeem the property under the provisions of the ninth article, and all payments, moneys and expenses due the association, the monthly fines continuing until the sale of the property. The provisions of the ninth article as to redemption were, that it should be had by the payment of such a sum of money, as would at the rate of premium at which the corporate funds were selling at the time of redemption, produce the same monthly interest as that which the stockholder had been paying on the advance, in no event being less than the net sum advanced. In the event of the death of the stockholder, who had obtained an advance, his heirs or legal representatives were entitled to continue the relation of stockholder. But if they were unable or unwilling to do this, the directors were required to act as if default had occurred while the stockholder was living.

The transaction which this article delineates, is that which is common to associations of this character; and when the association is merely voluntary, or is endowed with corporate capacity, not having special authority to enter into such a transaction, its legal efficacy is a question upon which the authorities are conflicting. It is apparent, the manifest purpose of the enactment was to authorize and legalize the transaction—to relieve it from the uncertainty in which it would have been involved, if it was without express legislative sanction. In the absence of such sanction, we could not hesitate to pronounce the transaction usurious; and that the mortgage was valid and operated as a security only for the sum of money actually advanced, or loaned, the lawful interest thereon, and such payments of taxes or insurance on the property, or other proper expenses of its conservation, as the association had actually paid;

and that all payments made by or for the mortgagor, except his contributions as a member of the association, should be applied first to the reimbursement of such expenses, then to keeping down the interest; and when these expenses were satisfied, the interest extinguished, if a surplus remained, it should be applied to the reduction of the principal.—*Mobile Mut. B. & L. Ass. v. Robertson*, 65 Ala. 382; *Smith v. Garth*, 32 Ala. 368; *Mut. Sav. Bank & Build. Ass. v. Wilcox*, 24 Conn. 147; *Kupfert v. Guttenburg Build. Ass.*, 30 Penn. St. 465; *Link v. Germantown Build. Ass.*, 89 Penn. St. 15; *Mills v. Salisbury B. & L. Ass.*, 75 N. C. 292; *Herbert v. Kenton Build. & Sav. Ass.*, 11 Bush (Ky.) 296; *Columbia Build. & Loan Ass. v. Bollinger*, 12 Rich. Eq. (S. C.) 124. The General Assembly ordained the statute against usury, and its power to designate the transactions which shall be deemed offensive to, or which shall be excepted from the influence of the statute is not questioned. When it lends express sanction to a particular transaction, from the operation of the statute that transaction is withdrawn and excepted.—*Bibb County Loan Ass. v. Richards*, 21 Ga. 592; *Mut. Sav. Bank & Build. Ass. v. Wilcox, supra; Franklin Build. Ass. v. Marsh* 29 N. J. Law, 225; *Clarkeville B. & L. Ass. v. Stephens*, 26 N. J. Eq. 351; *Hagerman v. Ohio Build. & Sav. Ass.*, 25 Ohio St. 186; *Hekelnkœmper v. German Build. & Sav. Ass.*, 22 Kansas, 549.

The intestate, Lawler, having on the 20th July, 1869, obtained an advance of two thousand dollars, less the premium, on ten shares of stock held and owned by him in the association, for which he gave his promissory note, secured by mortgage on real estate, the transaction conforming to the terms of the 8th article of the constitution, died in October, 1870. At the time of his death he was not in default to the association; and after his death, for some time, his personal representative made payments to the association, which were applied to dues and monthly interest, as if the membership in the association was continuing. It was not until January or February, 1874, that the association took any steps for the foreclosure of the mortgage, and during the whole period intervening after Lawler's death, dues, including monthly interest and fines for non-payment, are claimed. The question arising on this state of facts is, what sum, or sums can be claimed by the association on the redemption of the mortgaged premises.

The act of incorporation intends that the death of a member shall operate a dissolution of his membership, terminating his connection with the association. Upon his heirs or his legal representatives there is conferred the privilege of succeeding to, or in the words of the constitution, continuing the membership. If the privilege is exercised, they

become members, not in a representative capacity, but in their own right; and are subject individually to the duties and liabilities of membership. If the member dying has not obtained an advance upon his stock within four months after his death, his heirs or legal representatives could assert the privilege of succeeding to, or continuing the membership by the payment of all dues, fines, and arrearages which had accrued. But if within that period, they do not assert the privilege, and make the payment, the association becomes bound to refund, not to the heirs or legal representatives, but to the *personal representative* on demand, the amount the deceased had paid upon his stock, with eight per cent. interest thereon, deducting charges for fines, arrearages, and the proportion of the losses and expenses of the association the stock ought to bear. It is scarcely necessary to say, that the personal representative only can receive this sum and acquit the association of liability on it. Or if the deceased member had been advanced upon his stock, his heirs or legal representatives may succeed to, and continue the membership, *the proper change of name being first made in the security papers.* If they are unable or unwilling to effect this change, the board of directors are required to act as if it were the case of a living shareholder, who, for three successive months, had failed to pay dues to the association. The privilege of continuing the membership is conferred only on heirs or legal representatives, not on the *personal representative,* the executor or the administrator. Such privilege could not well be conferred on the personal representative, limited in authority and duty, and not having capacity to make or continue contracts charging the assets in his hands for administration—certainly not hazardous or speculative contracts which may not yield profit, and may involve a loss of the assets the law devotes to particular uses and purposes.

The nature, purpose, incidents and liabilities of membership in the association, exclude the hypothesis that an executor or administrator, unless it be an executor having authority by the will of the testator, can employ the assets in his hands for administration, in the continuance of membership in the association. These assets are devoted by law, primarily to the payment of debts, and after the payment of debts, to distribution to the next of kin in cases of intestacy, or if there be a will, to distribution as it may appoint. The line of the duty and authority of the personal representative is distinctly marked, and it corresponds precisely to the accomplishment of these purposes. The object of the association, expressed in the first article of the constitution, is, " the accumulation of a fund by the monthly subscriptions or savings of the members thereof to assist them in procuring for themselves such real estate as they

may deem desirable." There is no power in a personal repre-
sentative, in the absence of express testamentary provision, to
employ the assets either in investments or for accumulation.
An inseparable incident for membership is the right to antici-
pate stock by obtaining an advance thereon. Such advance
can not be obtained unless security by a mortgage of real
estate is furnished the association. Borrowing money is not a
power or duty of a personal representative, and to the real
estate of his intestate or testator he has no title which could
be conveyed by mortgage. When the clause of the constitu-
tition referring to the continuance of membership, in the event
of the death of a member who has taken an advance on stock,
is read, it seems self-evident, that it is the heir, or the devisee
only, who is invested with the privilege of continuing the mem-
bership. The continuance can be obtained only by *the proper
change of name being first made in the security papers*. The
change—a proper change—could be effected only by the heir
or devisee, succeeding to the estate of the deceased ancestor in
the lands mortgaged as security, and not by the personal repre-
sentative, having no estate in them.

The death of Lawler terminated his membership in the as-
sociation and relieved him from all liability to pay dues of any
kind to it. That liability is an incident of membership, and
the two must co-exist. The sum which must be paid to redeem
the premises from the mortgage is very clearly pointed out by
the constitution. It is not the nominal sum for which the
promissory note is given; nor is it the sum of money which
was actually loaned or advanced to Lawler, though in no
event, can it be less than that sum. It is the sum of money,
which, at the rate of premium at which the funds of the asso-
ciation were selling at the time of his death, would produce
the same monthly rate or payment of interest he had been pay-
ing on the loan or advance. This saves to the association all
the benefits which would accrue if death had not intervened
terminating the membership and the contract. A different
rule would be applied, if Lawler had lived, falling into default
in the payment of dues to the association. Such default visited
with fines can not occur, when death terminates the member-
ship. If the heir or devisee in whom resides the estate in the
mortgaged premises, does not elect to exercise the privilege of
continuing or succeeding to the membership—if he does not
cause the proper change to be made *in the security papers*, by
which they become his contracts, ceasing to be the contracts of
the ancestor, the association must proceed to a foreclosure of
the mortgage. The foreclosure can not be neglected, or in-
definitely delayed, and dues, monthly interest and fines suffered
to accumulate, increasing the mortgage debt, burdening the

[Kight v. Luke.]

equity of redemption. The liability of the mortgaged premises, according to the constitution of the association is the sum of money which at the rate of premium the funds of the association were selling at the time of Lawler's death, would produce the same monthly payment of interest, as that which he had been previously paying on the advance, not to be less in any event than the net amount he actually received. This is all which could have been demanded of him, if at the instant of his death he had come to redeem, there being no default in the payment of any dues ; and it is the extent of the demand which may rightfully be made of his creditor, or of his personal representative, coming in to redeem after his death. To this sum must be added any payment of taxes or of insurance which the association may have made. The re-inbursement of such payments, made for the conservation of the mortgage estate, is an undoubted equity of a mortgagee.

The result is, the decree of the chancellor must be reversed, and a decree will be here rendered in accordance with this opinion.