## STATE v. MORGAN.

1. When a party assails the constitutionality of an act, he must show beyond reasonable doubt that it is in violation of the fundamental law of our government. Every presumption is in favor of the validity of a legislative enactment, and it is for the attacking party to show that his rights are invaded by that act, and that it does not come within the legitimate exercise of the lawmaking power, under the constitution.

2. The object of Section 21 of Article 3 of the constitution of the state, which provides that "no law shall embrace more than one subject, which shall be expressed in its title," was to prevent the bringing together in one act subjects having no necessary connection or relation

with each other, and to guard the legislatures and communities affected by the law against surprise and imposition; and it is mandatory,—a direct, positive, and imperative limitation upon the legislature.

3. This action of the constitution was not intended to embarrass the legislature in the legitimate exercise of its powers by compelling a needless multiplication of bills designed to meet the same object. A liberal interpretation and construction should be given it by the courts so as not to cripple or limit legislative enactments any further than is necessary for the requirements of the law. The ground that an act embraces more than one subject, and that it was not sufficiently expressed in its title, should be grave, and the conflict between the statute and constitution plain and manifest, before courts will be justified in declaring it unconstitutional and void.

4. When the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably included in it, and all measures which will or may facilitate the accomplishment of the purpose, are germane to its title. The title must express the subject comprehensively enough to include all the provisions in the body of the act. It need not index all its details, but it should indicate the purpose of the legislature in the enactment.

5. A portion of a statute may be unconstitutional and stricken out, and if that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which is rejected, the statute must be sustained.

6. If, upon examination, the general meaning and object of the statute be found inconsistent with the literal import of any particular clause or section, such clause or section must, if possible, be construed according to that purpose.

7. Mercantile or commercial agencies are not such legitimate and useful instruments of commerce or commercial intercourse as to put them exclusively under the regulation of congress, and free from state control, and a legislative enactment providing for the organization of such companies, and the regulation of their business within the limits of the state, is not an interference with interstate commerce, and is not void because in violation of the commerce clause of Section 8, of Article 1 of the constitution of the United States.

(Syllabus by the Court. Opinion filed March 19, 1891.)

Error to McCook county court.

Information charging the plaintiff in error with a violation of the provisions of Chapter 54 of the Laws of South Dakota of 1890. Verdict of guilty rendered and judgment thereupon entered. Defendant brings error to this court. Affirmed.

The facts and the nature of the proceedings are fully stated in the opinion.

*Bailey & Stoddard,* (*Samuel Wagner, of counsel,*) for plaintiff in error.

Chapter 54 of the Session Laws of South Dakota of 1890, relating to commercial agencies, credit companies and guaranty associations conflicts with the constitution of the United States in that it is an attempt to regulate commerce and commercial intercourse and is an assumption of power by the state legislature which rests solely in congress by virtue of Section 8, Article 1 of the constitution of the United States. Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1; Robbins v. Shelby, etc., 120 U. S. 489; Gibbons v. Ogden, 9 Wheaton, 1; Brown v. Maryland, 12 Wheaton, 419; The Passenger cases, 7 How, 283; Welton v. Missouri, 91 U. S. 275; Sherlock v. Allin, 93 U. S. 103; Inman Co. v. Tinker, 94 U. S. 238; Railroad v. Husen, 95 U. S. 465; Mobile County v. Kimball, 102 U. S. 691; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196; Brown v. Houston, 114 U. S. 622; Walling v. Michigan, 116 U. S. 446; Railroad v. Illinois, 118 U. S. 557; W. U. Tel. Co. v. Pendleton, 122 U. S. 347; Steamship Co. v. Pennsylvania, 122 U. S. 326; Leloup v. Mobile 127 U. S. 640; Asher v. Texas, 128 U. S. 129; Minnesota v. Barber, 10 Sup. Ct. Rep. 862; *In re* Barber, 39 Fed. 641; *Ex parte* Kiefer, 40 Fed. 399; Swift v. Sutphin, 39 Fed. 630; State v. Oil, Gas and Mining Co. 22 N. E. 778; Leisy v. Hardin, 135 U. S. 100; State v. Stilsing, 20 At. 65; State v. Intoxicating Liquors, 19 At. 913; *In re* Beine, 42 Fed. 545; Schandler Bottling Co. v. Welch, 42 Fed. 561; Tuchman v. Welch, 42 Fed. 548; Lyng v. Michigan, 135 U. S. 161.

This act further conflicts with Section 35 of Article 3 of the constitution of the State of South Dakota, which provides that ''no law shall embrace more than one subject, which shall be expressed in its title.'' This act violates the constitutional provision in that it embraces not one but three distinct subjects, and the subject of the bill is not expressed in its title, and the act not only attempts to authorize and regulate the business of commercial agencies, credit companies and guaranty associa-

tions, but also attempts to impose upon them a gross earnings tax. People v. Hamill, 17 N. E. 799; Dolese v. Pierce, 124 Ill. 140; Lockport v. Gaylord, 61 Ill. 279; People v. Mellen, 32 Ill. 181; Railroad v. Lake View, 105 Ill. 183; People v. Parks, 58 Cal. 624; People v. Denahy, 20 Mich. 349; Walker v. State, 49 Ala. 329; State v. Silva, 9 Nev. 227; Board v. McGruder, 6 S. E. 232; Ragio v. State, 6 S. W. 401; State v. Kinsella, 14 Minn. 524; State v. Murray, 41 Minn. 123; Brown v. State, 4 S. E. 861; Touzalin v. Omaha, 41 N. W. 796; Hatfield v. Commonwealth, 120 Pa. St. 395; Commonwealth v. Frantz, 19 At. 1025; Potter's Dwarris on Stat. pp. 102, 105; Railroad v. Board, 9 Neb. 252; People v. Gadway, 61 Mich. 285.

This law is further unconstitutional in that it conflicts with Section 2, Article 11 of the constitution of the State of South Dakota, which provides that "all taxes to be raised in this state shall be uniform on all real and personal property according to its value." Franklin Ins. Co. v. State, 5 W. Va. 349; Parker v. Ins. Co. 7 So. Rep. 599.

This law is also in conflict with Section 6 of Article 11 of the constitution of South Dakota, in that it levies a tax but states no object to which the tax shall be applied. People v. Board, 52 N. Y. 556.

*Robert Dollard, Attorney General* and *E. H. Wilson, State's Attorney McCook County*, for defendant in error.

Before annulling by judicial sentence what has been enacted by the law-making power it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumption. Cooley Cont. Lim. 221; People v. Supervisors, 17 N. Y. 235; Boisden v. Bank, 9 La. An. 506. Not all phases of interstate commerce are exempt from the operation of state law, and this act is not an invasion of the powers of congress. Wordruff v. Parban, 8 Wall 123; Hinson v. Lott, 8 Wall. 148; Low v. Austin, 13 Wall. 29; Cook v. Pennsylvania, 97 U. S. 566; Machine Co. v. Gage, 100 U. S. 676; Brown v. Houston, 114 U. S. 622; Smith v. Alabama, 124 U. S. 465; Railroad v. Alabama, 128 U. S. 96.

The act in question does not conflict with the constitutional

provision that "no law shall embrace more than one subject, which shall be expressed in its title." The subject of this act is the regulation of the business of commercial agencies, credit companies, and guaranty associations. True it operates upon more than one object, but that does not effect its constitutionality. The subject being single, the objects upon which the law acts may be manifold. Commonwealth v. Frintz, 19 At. 1025; Cassill v. Lexington Road Co. 9 S. W. 502; Wardle v. Townsend, 42 N. W. 950; *Ex parte* Livingstone, 21 Pac. 322; Fahey v. State, 27 Tex. App. 146; Anderson v. Mayor, 8 S. E.; Indianapolis v. Huegule, 115 Ind. 581; Evansville v. State, 118 Ind. 426.

BENNETT, J. An information was filed in the county court of McCook county by the state's attorney, charging the plaintiff in error with a violation of the provisions of Chapter 54 of the Laws of the legislature of the State of South Dakota of 1890. A trial was had at the July, 1890, term of that court, before a jury, and a verdict of guilty rendered. A fine of $250 and costs was imposed by the court. To that judgment this writ of error is taken. From the record in the case it appears that plaintiff in error was arrested at Salem, McCook county, on July 1, 1890, while acting as a special agent of R. G. Dun & Co., a mercantile agency doing business as such in Chicago, New York and other large cities of the United States and Canada. He came to this place for the purpose of investigating the mercantile standing of G. H. Grannis & Son, merchants doing business in Salem, S. D.; the information to be used for the benefit of the customers of R. G. Dun &. Co. On the trial the only witness called for the state was G. W. Grannis, and Charles A. Morgan testified on his own behalf. From the testimony it appeared, without contradiction, that the mercantile agency of R. G. Dun & Co. is a commercial agency, within the meaning of Chapter 54, Sess. Laws 1890; that R. G. Dun & Co. had not complied with the provisions of that act, and were not entitled to transact business in this state under its provisions; that plaintiff in error was acting as agent of R. G. Dun & Co. in receiving and procuring reports, and that he had obtained

no certificate of authority from the state auditor. All these facts are admitted, and this court is asked to reverse the judgment in this case on the sole ground of the unconstitutionality of the law under which the information was filed.

Section 21 of Article 3 of the constitution of the State of South Dakota provides: "No law shall embrace more than one subject, which shall be expressed in its title." The title of Chapter 54 of the Session Laws of 1890 is "An act to authorize and regulate within the state the business of commercial agencies, credit companies, and guaranty associations." The plaintiff in error contends that this act violates the constitutional provision in two particulars: *First*, it embraces not one, but three, distinct subjects, commercial agencies, credit companies, and guaranty associations; *second*, the subject of the bill is not expressed in its title, and the act not only attempts to authorize and regulate the business of commercial agencies, etc., but also attempts to impose upon them a gross earnings tax.

Chapter 54 of the Session Laws of 1890 provides that no company, association, individual, or association of individuals, formed under the laws of this or any other state or foreign government, shall transact the business of a commercial agency, without first receiving a certificate from the state auditor. The act also provides that the state auditor shall issue no certificate unless a deposit of $50,000 be made with the state treasurer, and other formalities complied with. The act further provides that the individual, company or association transacting the business of a commercial agency within this state shall make a sworn statement of their financial condition, and pay into the hands of the state treasurer a specific tax of 2 per cent on the total amount received from all sources growing out of the business transacted in the state. The act makes it unlawful for any person to act within the state, as agent or otherwise, in receiving or procuring reports, etc., without having procured from the state auditor a certificate of authority therefor, and imposes as a penalty for the violation of any of its provisions a fine of not less than $250. The question involved in this case has been ably and thoroughly discussed by learned

counsel. In the preparation of this opinion, and in the conclusion at which we have arrived, we have been greatly assisted by and are under obligations for the full and complete collection of authorities in the briefs presented at the arguments made by the plaintiff in error, as well as by the attorney general, and we take pleasure in making this acknowledgment. The nature of the investigation upon we are about to enter renders the following citation from the pen of Chief Justice. SHAW, in the case of *In re* Wellington, 16 Pick. 95, peculiarly appropriate: "The delicacy and importance of the subject may render it not improper to repeat what has been so often suggested by courts of justice, that, when called upon to pronounce the invalidity of an act of legislation, passed with all the forms and solemnities requisite to give it force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond a reasonable doubt." Judge COOLEY, another eminent jurist, also announces another principle in his Constitutional Limitations, (5th Ed. 193,) as follows: "Being required to declare what the law is in the cases which come before them, they [courts] must enforce the constitution as the paramount law, whenever a legislative enactment comes in conflict with it." We may safely assert, from a careful examination of authorities and decisions of our most eminent courts, that the general rule is that, when a party assails the constitutionality of an act, he must show beyond reasonable doubt that it is in violation of the fundamental principles of our government. Every presumption is in favor of the validity of a legislative act, and it is for the attacking party to show that his rights are invaded by that act, and that it does not come within the legitimate exercise of the powers conferred by the constitution.

The provisions of our constitution in relation to the title af enactments of the legislature are found contained in the constitutions of 27 of the states of the union. The variations are

slight and immaterial,—some requiring the object, others the subject, of the act to be expressed in the title; some declaring the whole enactment void, others only so much thereof as is not so expressed. The courts of these several states with great uniformity have concurred in sustaining their constitutions, and without hesitation condemning the legislation in violation of its provisions. The object and purpose of such a constitutional provision has been very clearly and tersely stated by the supreme court of Michigan, in the case of People v. Mahaney, 13 Mich. 494. The court says: "The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together in one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state. It was scarcely more so, however, than another practice, also intended to be remedied by this provision, by which, through dexterous management, clauses were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. This clause was not designed to embarrass legislation by multiplying the number of bills, but it was intended to put an end to vicious legislation, which was little better than a fraud on the public, and to require that in every case the proposed measure should stand upon its own merits." Judge GARDNER, of New York, says the purpose was that neither the members of the legislature nor the public should be misled by the title. Insurance Co. v. Mayor, 8 N. Y. 241. Judge COLE, of Wisconsin, says the design and purpose of the provision was obviously to prevent the mischief of uniting together, in the same bill, various objects which had no necessary connection with each other, and in order to guard the legislature and community affected by the law against surprise and imposition. Durkee v. City of Janesville, 26 Wis. 697. The supreme court of Iowa says: "The

intention of the provision of the constitution was to prevent the union, in the same act, of incongruous matter, and of objects having no connection, no relation, and with this it was designed to prevent surprise in legislation, by having matter of one nature embraced in a bill whose title expressed another." State v. Judge, 2 Iowa, 280; State v. Silver, 9 Nev. 227. And similar expressions may be found in many reported cases. St. Louis v. Tiefel, 42 Mo. 578; Mayor v. State, 4 Ga. 38; Davis v. State, 7 Md. 151. Judge COOLY, in his work on Constitutional Limitations, (5th Ed. 173,) says: "It may therefore be assumed as settled that the purpose of these provisions was—*First*, to prevent 'hodge podge' or 'log-rolling' legislatson; *second*, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked, and carelessly and unintentionally adopted; and, *third*, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they so desire."

In view of these citations, and many more to the same effect that might be quoted, the object of the constitutional limitation and restriction is plain, and clearly defined. The object of this constitutional provision, and the mischief intended to be remedied, having been ascertained, it then becomes necessary, for its proper construction, to know whether it is mandatory or merely directory. It would seem, in a general sense, to be a dangerous doctrine to announce that any of the provisions of the constitution may be obeyed or disregarded at the mere will or pleasure of the legislature, unless it is clear beyond all question that such was the intention of the framers of that instrument. The fundamental law is paramount to all others, and to say that any of its provisions are unessential, and of no particular importance, would seem to be lowering the dignity of the ground work upon which all law is based. If it should be looked upon as directory, and so treated by the legislature, the moral obligation resting upon them to faithfully support the

constitution would be disregarded. and soon laws would be enacted that would be outside of and beyond the limits of that instrument. In all the states having such a restrictive provision, in which the question has arisen, except Ohio, and California, under her former constitution, the command has been held to be mandatory. In Cannon v. Mathes, 8 Heisk, 504, NICHOLSON, C. J., calling attention to the words of the constitution, that "no bill shall become a law which embraces more than one subjet." "This," he said, "is a direct, positive, and imperative limitation upon the power of the legislature; * * * it is not a law of the state if it embraces more than one subject." The same, in substance, are the following decisions, upon similar constitutional provisions: Huber v. People, 49 N. Y. 132; People v. Parks, 58 Cal. 635; People v. Fleming, 7 Colo. 230, 3 Pac. Rep. 70; Association v. Robinson, 69 Ala. 413; Supervisors v. Heenan, 2 Minn. 330; (Gil. 281;) Cannon v. Hemphill, 7 Tex. 184; Commissioners v. Bailey, 13 Kan. 607; State v. Miller, 45 Mo. 495; Pennington v. Woolfolk, 79 Ky. 13; Dolese v. Pierce, 124 Ill. 140, 16 N. E. Rep 218; People v. Denaby, 20 Mich. 349.

It will thus be seen that the courts, with great unanimity, enforce the constitutional provision in all cases falling within the mischiefs intended to be remedied. Upon a critical examination of these cases, however, it will be seen that, while it is necessary to construe this provision so as to prevent the evils intended to be met, yet it is desirable to avoid the opposite extreme, so as not to embarrass the legislature in the legitimate exercise of its powers, and compel a needless multiplication of bills, designed to meet the same object. The court says, in the case of State v. Miller, 45 Mo. 497: "The courts, in all the states where a like or similar provision exists, have given a liberal interpretation, and have endeavored to construe it so as not to limit or cripple legislative enactments any further than what was necessary by the absolute requirements of the law." The objections to an act upon the ground that it embraced more than one subject, and that it was not sufficiently expressed in its title, should be grave, and the conflict between the stat-

ute and constitution plain and manifest, before courts will be justified in declaring it unconstitutional and void. The constitutional clause under consideration is that no law shall embrace more than one subject, which shall be expressed in its title. In some of the state constitutions the word ''object'' has been used instead of ''subject.'' In the construction of this clause the courts have used the words synonomous; which, strictly speaking, is not so. The ''subject'' of a statute is the matter of public or private concern for which the law is enacted; the object is the aim or purpose of the enactment.

The constitutional requirement in our constitution is addressed to the subject. This subject must be single. The provisions of the act must all relate directly to the same subject, have a natural connection, and not be foreign to the subject as stated in the title. The title must state the subject of the act for the information, not only of the legislature, but of the public generally. When the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will or may facilitate the accomplishment of the purpose so stated, are germane to its title. There is no constitutional restriction as to the scope or magnitude of the single subject of a legislative act. It has been held that an act to establish the government of the state embraces but a single subject or object, yet it includes all its institutions,—all its statutes. In Bowman v. Cockrill, 6 Kan. 311, the court says: ''The unity of such an act, covering the multiform concerns of a commonwealth, is the congruity of all the details as parts of one 'stupendous whole,' of one government. That is the grand subject of such a statute or system of laws; it is equally the object of all its varied titles of chapters and sections.'' Such is an act creating municipal corporations. Such a statute creates the corporate entity; invests it with and regulates the exercise of the necessary legislative, taxing, judicial, and police powers. It embraces but one subject. The separate provisions, granting, defining and regulating these powers, are but parts of a whole, and essential to make a whole, a municipality.

Harris v. People, 59 N. Y. 599; Montclare Tp. v. Ramsdell, 107 U. S. 147, 2 Sup. Ct. Rep. 391; Grover v. Trustees, 45 N. J. Law, 399. One act may define all the crimes and provide the procedure in prosecutions. Each crime is distinct; the practice is distinct; but all the provisions of such an act are congruous parts of a larger subject, which is an entirety. State v. Brassfield, 81 Mo. 151–161. Whatever may be the scope of act, it can embrace but one subject, and all its provisions must relate to that subject. They must be parts of it, incident to it, or in some reasonable sense auxillary to the object in view. This constitutional requirement is addressed to the subject, not to the details, of the act. That subject must be expressed in the title. The subject must be single; the provisions to accomplish the object involved in that subject may be multifarious. It is not enough that the act embraces but one subject, and that all its parts are germane; but the title must express the subject, and comprehensively enough to include all the provisions in the body of the act. The title need not index all the details of the act. It is sufficient if the language used in the title, on a fair construction, indicates the purpose of the legislature, so that making every reasonable intendment in favor of the act it may be said that the subject of the law is expressed in the title. As said by the supreme court of Illinois, in the case of Johnson v. People, 83 Ill. 436, the constitution does not require that the subject of the bill shall be specifically and exactly expressed in the title; hence we conclude that any expression in the title which calls attention to the subject of the bill, although in general terms, is all that is required. The constitution authorizes one subject, and any number of matters, provided they have any natural or logical connection with each other in legislation.

Having thus briefly stated some of the general principles and rules of construction relating to this constitutional provision, let us endeavor to apply them to the statute before us. We have said that the provision of the constitution is mandatory; that is, that no law shall embrace but one subject, which shall be expressed in its title. Yet in cases not clearly within

the mischief intended to be remedied by requiring the subject of an act to be single, and to be expressed in the title, legislation will not be adjudged void on any nice or hypercritical interpretation. Sound policy and legislative convenience dictate a liberal construction of title and subject matter. The title of Chapter 54 is as follows: "An act to authorise and regulate within this state the business of commercial agencies, credit companies, and guaranty associations." The subject of the act is authorizing the formation of, and the regulating the business of, these companies. The subject is single; it provides a single mode of procedure and requirement for companies designated by the various names, as shown in the title. It says that each shall procure a certificate from the state auditor before transacting business in their respective lines within the state. It then requires each company or association to have a capital of $50,000, and a deposit of the same amount with the state treasurer, or with the chief financial officer or auditor of the state, where such company or association is organized. It also provides for a resident attorney upon whom process may be served, and for an annual statement of its financial condition, its income and expenses, and for the payment of a specific tax of 2 per cent of its total receipts for business done in the state. It also provides for the manner of the appointment of agents, and a penalty for doing business without complying with its provisions. The subject is general; that is, authorizing and regulating these companies. The means of effecting the purpose are diverse, but there is no want of unity on the subject. One of the means of effecting the regulating of them is the denial of the right to do business unless they shall obtain a certificate from the auditor of the state, but before the auditor can issue it the requirements of the statute must be complied with. But both of these are directed to the attainment of one general purpose, and both are connected with the subject of the act, and are but details of that subject. The business of these companies may be of a different nature, fo far as they are severally concerned, but the act has no relation to that matter. It does not create or define the respective objects of these organiza-

tions, but says, before each one shall do business in the state, according to their several avocations, they must comply with the statutory regulations.   There is no force in the position that, because the classes of the institutions have no connection whatever with each other in their business relations, the legislature cannot enact a law that will regulate and govern all.

But objection is urged that the act has a plurality of subjects, because Section 3 imposes a gross earnings tax of 2 per cent, and provides for the method of its payment, and because Section 6 imposes penalties for the violation of its provisions. The subject of an act expressed in the title includes not only all matters which are constituent parts of it, but all matters directly incidental to it.   Plank Road Co. v. Hannaman, 22 Ind. 484; City of St. Louis v. Green, 7 Mo. App. 468; Canal Co.  v. Bright, 8 Colo. 144, 6 Pac. Rep. 142; English v. State, 7 Tex. App. 171.   "An act concerning drainage" includes, for this reason, assessments upon lands benefitted to pay the expense. Wishmier v. State, 97 Ind. 160.   So a grant of lands in aid of public improvements may contain a provision exempting the land from taxation for a limited term.   Prescott v. Bebee, 17 Kan. 32.   An act to regulate a specific business may prescribe penalties for violation of the act.     Insurance Co. v. Commissioners, 70 Mich. 485, 38 N. W. Rep. 474; Will v. State, 46 Ohio St. 450, 21 N. E. Rep. 643; Sykes v. People, 127 Ill. 177, 19 N. E. Rep. 705; State v. Stunkle, 41 Kan. 457, 21 Pac. Rep. 675. A statute embracing only one general subject, indicated by its title, is constitutional, no matter how fully it may enter into the details of that subject.   Turnpike Co. v. Fletcher, 104 Ind. 97, 2 N. E. Rep. 243; Canal Co. v. Bright, 8 Colo. 144, 6 Pac. Rep. 142; People v. Goddard, 8 Colo. 432, 7 Pac. Rep. 301. As a means of enforcing a law for regulating and licensing the sale of intoxicating liquors, it may provide that a house where such liquors are sold, if kept in a disorderly manner, may be deemed a common nuisance; that so keeping it shall cause a forfeiture of the license, and subject the offender to a fine Fletcher v. State, 54 Ind. 462; O'Kane v. State, 69 Ind. 183 As a means of enforcing the payment of a special tax on deal

ers in liquors, it is germane to provide that upon failure to pay such tax the dealer may be indicted and punished for a misdemeanor. Brown v. State, 73 Ga. 38; Howell v. State, 71 Ga. 224.

It can readily be seen from the authorities above cited that the constitutional provision permits an announcement of the subject of an act in its title, in general terms, but, in order to facilitate legislation, a very liberal construction will be given to all matters which are pertinent or germane to the subject of the enactment. The controlling purpose of the act under consideration is the regulating the companies or associations named in the title. Incidental to the purpose is the imposition of the tax, and the penalties imposed for doing business in violation of its provisions. These are subsidary details, which are means for carrying into effect the object or purpose of the act disclosed in the subject, and do not create a plurality of subjects.

The third objection urged against the validity of the law is that it is in violation of Section 2, Article 11, of the constitution, which provides that "all taxes to be raised in this state shall be uniform on all real and personal property, according to its value." We think the plaintiff in error is not in a position to raise this question at this time. The information under which he was arrested and tried states that he did wilfully and unlawfully act within the State of South Dakota as an agent for R. G. Dun & Co., in securing and procuring reports upon the financial resources and standing, personal credit, honesty, and business methods of one G. H. Grannis & Son, for R. G. Dun & Co., * * * the said R. G. Dun & Co. being then and there an association; * * * and did then and there so receive and procure such reports, without having procured from the state auditor a certificate of authority therefor, * * * contrary to the statute in such case made and provided." It was admitted on the trial that R. G. Dun & Co. is a mercantile agency, within the meaning of the statute under consideration. The offense charged was non-compliance with the law in not procuring from the state auditor a certifi-

cate to legally do business within the state, and not for non-payment of the specific tax upon the business done by such association. If the plaintiff in error were defending against the payment of this tax, or had been arrested upon a complaint specifically stating this as the cause why he should not do business in the state, or had he shown that the association he represented had a capital of $50,000, and had made the required deposit with the state treasurer, or chief financial officer or auditor of the state where the association was formed, in the manner provided, and had complied with the law in other respects, so that he could demand a certificate of the auditor to do business, and been refused, in a proceeding to compel the issuance of it, it would have been material to inquire into the validity of that provision. This, however, is not the case. The record discloses no effort of the defendant to comply with the law, but, on the contrary, it was ignored *in toto;* and, even if this portion of the statute should be held to be void because unconstitutional, the balance of the law would be operative. All of that portion of Section 3 which relates to the filing of an annual statement of business, and the payment of a specific tax of 2 per cent on the total amount, might be stricken out, and still the law would be perfect. The rule is that when the unconstitutional portion is stricken out, if that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the good and bad parts of the statute are capable of being separated, within the meaning of the rule. Cooley Const. Lim. (5th Ed.) 177. The first section of the act provides that it is unlawful for any company, association, individual, or association of individuals to, directly or indirectly, transact business of either commercial agencies, credit companies, or guaranty associations, without first receiving a certificate from the state auditor. Section 2 provides that the auditor shall not authorize any of these to do business unless they have $50,000 paid up capital, and make a deposit of $50,-000 with the state treasurer of this state, or the chief financial

officer or auditor of the state, where such company or associa-
tion is organized, and provides for the appointment of a resi-
dent attorney upon whom process can be served. Section 3
provides for a gross earnings tax, and it also provides that the
payment of this tax shall be a condition precedent to the issu-
ance of a certificate. It is contended that, the payment of this
tax being made a condition precedent to the procuring of a cer-
tificate, if all the other requirements had been complied with,
the auditor could not issue his certificate until the reports had
been made and the tax paid, and therefore, if the third section
is void, the first and second must be also. In the construction
and interpretation of statutes, the presumption is that the law-
maker has a definite purpose in every enactment, and has
adopted and formulated the subsidiary provisions in harmony
with that purpose. That purpose is an implied limitation on
the sense of the general terms. These are all to be brought
into harmony, if possible, and so construed that no clause sen-
tence, or word shall be void, superfluous, or insignificant. It is
true, to read the law literally, the construction, sought to be
put upon this clause of the third section by the plaintiff in
error, may follow as indicated. But words and clauses in
different parts of a statute must be read in a sense which har-
monizes with the subject matter and general purpose of the
statute. No clearer statement has been made, or can be made,
of the law, as to the dominating influence of the intention of a
statute in the construction of all its parts, than is found in
Kent's Commentaries: ''In the exposition of a statute, the in-
tention of the law-makers will prevail over the literal sense of
the letter. When the words are not explicit, the intention is
to be collected from the context; from the occasion and neces-
sity of the law; from the mischief felt and the remedy in view;
and the intention is to be taken or presumed according to what
is what is consonant with reason and good discretion." 1 Kent,
Comm. 461. If, upon examination, the general meaning and
object of the statute be found inconsistent with the literal im-
port of any particular clause or section, such clause or section
must, if possible, be construed according to that purpose. Hol-

brook v. Holbrook, 1 Pick. 248. The purpose of this enact-
ment was to prevent the people and business firms of this state
from unjust, fraudulent and false reports as to their financial
standing, and to provide safe and responsible guaranty asso-
ciations, and to require bonds or other property to be placed
within the reach of our courts in case of injury done or an un-
justifiable use of this privilege to these companies and associa-
tions. It must be remembered that the company or association
of which the plaintiff in error was the agent is a foreign asso-
ciation. Its right to do business in the state is by comity. It
can do business in South Dakota only by virtue of the laws of
that state. The law-making power has seen fit to permit it to
do so under such restraints and regulations as it chooses to
impose. It was also, no doubt, the purpose of the law-makers
to provide that a tax should be paid by the companies and asso-
ciations for doing business within the state. Now, no reason-
able construction can be placed upon this act that will say that
the law-makers intended that either of these should be required
to pay a tax upon business that had never been done, or that
they should not do business until they had paid a tax upon
business done before the law became operative. Such a con-
struction would not be reasonable or just. Suppose a company
just organized, coming under the provisions of this act, having
done no business, wish to comply with the law, and should
duly apply to the auditor for a certificate of authority. It
should produce satisfactory evidence that it had $50,000 or
more of capital, actually paid up, and had made the deposit of
$50,000 as required by law, and had appointed an attorney upon
whom process could be served, and the auditor should say:
"No, I cannot issue the certificate, because you have not made
an annual sworn statement of your financial condition, business
done, and particularly the income and expense account, and
have not paid into the state treasury a specifix tax of 2 per
cent on the total amount received from all sources, growing
out of the business transacted in the state." The company,
or its duly authorized agent says: "We have done no business;

we are just organized; we have had no receipts, no income, upon which to pay the tax." "But," says the auditor, "the law says this is a condition precedent to the issuing of the certificate, and until you do this I cannot give it." The statement of the proposition reveals its absurdity, and we are not warranted in making any such construction of the intent of the law-makers. This section was intended to operate only upon business done after the issuance of the first certificate, and the companies or associations had been in legal operation long enough to make an income and acquire receipts from their business. No other construction would be in consonance with reason or good discretion, and these sections are not so intimately interwoven that one cannot stand without the other.

The remaining objection, and the one most strenuously urged for a reversal of the judgment, is that the statute under consideration is a regulation of commerce and commercial intercourse, and is an assumption of power by the state legislature which alone rests in. congress, by reason of Article 1, Section 8, of the constitution of the United States. This clause of the United States constitution has been so often before the courts, and has been so frequently discussed by eminent jurists, that, in arriving at a proper construction of it, our chief duty consists in ascertaining precisely what points are to be considered as definitely settled by a series of prior adjudications. We do not propose to go into a critical analysis of these decisions, nor of the reasoning on which they are founded, but will only state what we understand to be the propositions enunciated as settled as law upon this subject. In doing so, we will state we have examined all the authorities cited in the able brief of the plaintiff in error, and many more bearing more or less upon the question. From these we may deduce the following propositions, as having been definitely settled by state and United States courts: (1) That the term "commerce," as employed in the clause of Section 8 of Article 1 of the constitution of the United States, which is under consideration, consists of intercouse and traffic, including in these terms navigation; the transportation and transit of persons and property;

as well as the purchase, sale, and exchange of commodities.
For the regulation of commerce, as thus defined, there can be
but one system of rules applicable to the whole country, and
that congress is the only authority which can act upon that
subject. (2) That when congress, in the exercise of its con-
stitutional right, does legislate upon that particular subject,
its authority is paramount and exclusive. (3) That if the state
has not the constitutional power by means of direct legislation
to regulate such intercourse, it cannot, by indirect methods,
accomplish what it is forbidden to do. These propositions are
sustained by the following authorities: Gibbons v. Ogden, 9
Wheat. 1; Passenger Cases, 7 How. 283; Holmes v. Jennison,
14 Pet. 540; Sinnot v. Davenport, 22 How. 227; Hays v. Steam-
ship Co., 17 How. 596; Brown v. Maryland, 12 Wheat. 419;
Robbins v. Shelby Co., 120 U. S. 489, 7 Sup. Ct. Rep. 592;
Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1; Leloup v.
Port Mobile, 127 U. S. 640, 8 Sup. Ct. Rep. 1380; Asher v.
Texas, 128 U. S. 129, 9 Sup. Ct. Rep. 1.

Since the case of Gibbons v. Ogden, 9 Wheat. 1, it has
never been doubted that commercial intercourse is an element
of commerce which also comes within the regulating power of
congress, and that Article 1, Section 8, of the constitution, ex-
tends to all matters involving subjects which pertain to or af-
fect commerce. In view of these propositions of law relating
to commerce and commercial intercourse, the question for de-
termination is, are mercantile agencies such legitimate and use-
ful instruments of commerce as to put them exclusively under
the regulation of congress, and free from state control? Mer-
cantile commercial agencies, as we understand them, are estab-
lishments which make a business of collecting information re-
lating to the credit, character, responsibility, general reputa-
tion, and other matters affecting persons, firms, and corpora-
tions engaged in business, for the purpose of furnishing this
information to its customers for a cash consideration. These
agencies have become recognized and permanent adjuncts to
the world of trade. Their rise and progress are of but recent
date. According to a little work entitled "The Law Relating

to Mercantile Agencies," recently published by T. & J. W. Johnson & Co., Philadelphia, and written by I. W. Errant, the American system of mercantile agencies owes its origin to the work done by one Church, who was at first a commercial traveler. On his business tours it was his custom to make notes for his own use, as to the habits, etc., of different persons and firms with whom he dealt. Other merchants, hearing of his custom, would come to him, and ask information in relation to the same persons. At last he was employed by 30 New York houses to travel in the south and west to collect information for them. His labors suggested the idea of establishing an institution which should make a business of collecting information concerning the responsibility, etc., of local business firms and corporations that were seeking credit in the larger cities. In 1841 the first organized "Mercantile Agency" was formed by Lewis Tappan. This was followed in 1842 by one called "The Commercial Agency." The mercantile agency of Tappan was succeeded by Benjamin Douglas & Co., and this firm by R. G. Dun & Co. A few years after the establishment of the "Mercantile Agency" and the "Commercial Agency," J. M. Bradstreet established "The Improved Mercantile Agency," which was some years afterwards incorporated, and known as "The Bradstreet Company." The mercantile and commercial agencies were originally established for the purpose of reporting the credit of buyers. It was Bradstreet who first published a book giving ratings. The other agencies soon followed his example. Latterly, there have been established what are termed "Special Agencies," which confine themselves to reporting a particular business, such as furniture, stationery, jewelry, and hardware. Without going into details as to the methods employed by them, it may be said that the United States and Canada are divided into districts, each district reporting its territory, but there is a daily interchange of information between the districts. Correspondents are selected, residing in the several towns and cities, whose special business is to collect information relating to the resident business firms of their respective places. The agency is the agent of the merchant or

subscriber. The contract signed by a subscriber to "The Bradstreet Company" reads as follows: "The undersigned hereby employs the Bradstreet Company to investigate and report," etc. It is to be presumed that all the other agencies use similar contracts with their customers or subscribers. The following extract is taken from a written contract made between a subscriber and the R. G. Dun & Co. Agency, as reported in the case of Duncan v. Dun, tried in the United States circuit court for the eastern district of Pennsylvania, and found in 9 Cent. Law J., 151: "The said proprietors are to communicate to us, on request, for our use in our business, as an aid to us in determining the propriety of giving credit, such information as they may possess concerning the mercantile standing and credit of merchants, traders, manufacturers, etc., throughout the United States and Canada. It is agreed that such information has mainly been, and shall mainly be, obtained and communicated by servants, clerks, attorneys; and employes appointed as our sub agents in our behalf by the said R. G. Dun & Co. The said information to be communicated by the said R. G. Dun & Co. in accordance with the following rules and stipulations, with which we, subscribers to the agency as aforesaid, agree to comply faithfully, towit: * * * The said R. G. Dun & Co. shall not be responsible for any loss caused by the neglect of any of the servants, attorneys, clerks, and employes in procuring, collecting, and communicating the said information, and the actual verity or correctness of the said information is in no manner guaranteed by said R. G. Dun & Co." It will thus be seen that the business is merely a bureau of information, acting as the agent of its employers, and its object is to collect and impart information to those who pay for it. It is true that this information may be confined within the limits of the state, or it may cross state lines, both in its collection and its dissemination, but for this reason it cannot be called interstate commerce. It is strongly urged by the plaintiff in error that these agencies are instruments of commerce, and are just as necessary to modern commerce as railroads and telegraphs, and without them the free interchange of commerce

would be hindered and delayed. We are unable to agree with this contention. Information or intelligence is not an article of "commerce" in any proper meaning of that word. Neither are they subjects of trade and barter, offered in the market as something having an existence and value independent of the parties to them. Neither are they commodities, to be shipped or forwarded from one state to another, and there put up for sale. The information furnished by mercantile agencies to subscribers of their rating books is like other personal contracts between parties. It is individual in its character, and has no relation to the general public. The mercantile agency is not a common carrier. It is no intermediate instrument to disseminate its information, but it is a collecter, storer, and holder of it, to be given directly to those who wish to purchase or pay for it. The telegraph, the steamboat, and railroad are instruments of commerce, because it is by their instrumentality that articles and commodities are purchased, exchanged, and carried from one country or state to another. The telegraph and postoffice transmit the order from the purchaser to the seller; the steamboat and railway carry and deliver the goods and articles from the seller to the purchaser. A mercantile agency does neither. As well say that the ship builder, by whose skill and money a ship or steamboat is floated on river, lake or ocean; the mechanic, whose labor constructs, or the engineer who runs the engine or car upon the railroad; the operator who sends the message upon the wire,—are instruments of commerce, and properly coming within the clause of the United States constitution regulating interstate commerce. The business, as conducted by mercantile agencies, may be an adjunct of commerce and of commercial transactions, but it is a separate and distinct appliance, and does not come within the principles of law which govern or regulate either of them. The law under which the plaintiff in error was tried and convicted being valid, and no error appearing in the court below, its judgment is affirmed. All the judges concurring.